**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 13-125 |
| | ) | Judge Nora Barry Fischer |
| ERIC EWELL and WILLIAM FIELDER, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

I.   INTRODUCTION

In this heroin conspiracy case, Defendants Eric Ewell ("Ewell") and William Fielder ("Fielder") have filed two related pretrial motions challenging the Government's collection of evidence against them: Fielder's Motion to Quash Subpoena contesting the methods utilized by law enforcement to procure his recorded jail conversations from the Allegheny County Jail ("ACJ") and State Correctional Institution at Greensburg ("SCI-Greensburg"); and Ewell's Motion to Suppress arguing that the judicially authorized Title III wire interceptions of communications on his personal cell phone should be suppressed. (Docket Nos. 491, 492, 623, 649, 669, 689, 696). Ewell has been granted leave to join Fielder's Motion. (Docket Nos. 633, 636). The Government opposes both motions. (Docket Nos. 576, 630, 682, 695). These matters have been fully briefed and supported with the parties submitting documentary evidence and witness testimony which was presented to the Court at a motion hearing held on October 30, 2015. (Docket No. 679, 686). The official transcript of the relevant portions of those proceedings has been prepared and considered by the Court, and the parties have submitted post-hearing briefing further articulating their positions on these motions. (Docket Nos. 686, 682, 689, 695, 696). The Government declined to file a sur-reply brief as to the suppression motion by

the Court's deadline of January 4, 2016, and Defendants declined to seek leave to file further supplements by January 8, 2016 as to the motion to quash, causing the Court to take the motions under advisement after those deadlines expired. (*See* Docket Nos. 681, 691). After careful consideration of all of the parties' submissions and the evidence of record, and for the following reasons, Defendants' Motions [491], [623] are denied.

II. BACKGROUND

*A. Factual Findings*

This case arises from a joint investigation by the Drug Enforcement Administration ("DEA") and Internal Revenue Service ("IRS") into heroin trafficking, money laundering and other criminal activities during 2011 and 2013 by a number of individuals from the Larimer neighborhood located in the City of Pittsburgh's East End which law enforcement refers to as the "Larimer Drug Trafficking Organization." (*See* Docket No. 576 at 11). The investigation resulted in the indictment of at least nineteen (19) individuals for drug trafficking and related offenses at Criminal Numbers 12-48, 12-200, 12-309 and 13-125. *See generally* Crim. Nos. 12-48, 12-200, 12-309, 13-125. Seventeen (17) of these individuals have pled guilty to criminal charges. *Id.* The Government alleges that the two remaining defendants, Ewell and Fielder, were high ranking members of the Larimer Drug Trafficking Organization responsible for directing the activities of lower level members of the conspiracy. (Docket No. 576 at 11). At times during the conspiracy, Fielder was incarcerated at the ACJ and SCI-Greensburg while Ewell apparently was living in North Carolina. (Docket Nos. 492, 623). Ewell and Fielder are both charged with one count of conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. § 846. (Docket Nos. 141, 142). If

convicted, they are each potentially subject to severe penalties including a mandatory minimum of ten (10) years' incarceration and up to a life term. *See* U.S.C. §§ 841(a)(1), 841(b)(1)(A)(i).

One of the lead agents involved in the investigation is City of Pittsburgh Police Detective Eric Harpster, ("Detective Harpster")[1] who is also deputized as a DEA Task Force Officer. (Docket No. 686 at 50). Detective Harpster and Assistant District Attorney Russ Broman ("ADA Broman") testified at the motion hearing at which time they provided information concerning their respective roles in the investigation. (Docket No. 686). After having observed their demeanor and responses to questioning, the Court found both to be credible and forthright witnesses. *See United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (citations omitted) (It is well-settled that at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge."); *see also United States v. Garcia*, 521 F. App'x 71, 73 (3d Cir. 2013) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)) ("'[w]hen findings are based on determinations regarding the credibility of witnesses ... only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'").

Both also have extensive experience in their respective fields. Detective Harpster has twelve years of experience with the City of Pittsburgh Bureau of Police and has completed significant work in narcotics investigations at both the federal and state level. (Govt. Ex. 1, Misc. No. 12-58, 1/31/12 Affidavit). ADA Broman has been with the District Attorney's Office for nearly thirty (30) years. (Docket No. 686 at 20). He worked in the Violent Crimes and

---

[1] For convenience, the Court utilizes "Detective Harpster" throughout this Memorandum Opinion but recognizes his dual role as both a City of Pittsburgh police detective and DEA Task Force Officer.

Firearms Unit from 2006 through the present and previously worked in appeals for around seven years. (*Id.* at 20, 39).

Detective Harpster explained that in early 2011 he was investigating drug trafficking in the Larimer neighborhood within Zone 5 of the City of Pittsburgh. (Docket No. 686 at 66). The purpose of this investigation was to dismantle the entire Larimer Drug Trafficking Organization rather than to focus on individual arrests. (*Id.* at 58, 66). Detective Harpster was aware that several individuals living in that area had ties to the organization based on intelligence gleaned from cooperating sources and his observation and awareness of drug activities within the area. (Docket No. 686 at 57-58). William Fielder was one of these individuals. (*Id.*). Among other things, Fielder has a past state conviction for heroin distribution, was released from incarceration and placed on parole in early 2011 after serving a sentence of 5-10 years' incarceration for a criminal homicide conviction. (Docket No. 686 at 60). Fielder was also present during a controlled buy in June of 2011 at which time a cooperating individual identified as CS#3 purchased heroin from co-defendant Khalid Kareem. (Govt. Ex. 1, Misc. No. 12-58, 1/31/12 Affidavit). The Government admits that Fielder was not the seller in this transaction but alleges that he was present and made a veiled threat to CS#3 during the deal. (*Id.*).

Detective Harpster testified that one of the methods he used to investigate potential criminal activity was to obtain recorded jail calls of individuals whom he suspected may be involved in drug trafficking and had been arrested and incarcerated at the ACJ. (Docket No. 686 at 58). He explained that individuals actively involved in the drug trade may attempt to contact other individuals about their dealings while in custody. (*Id.*). Detective Harpster and another narcotics detective, Robert Kavals, would on occasion contact the District Attorney's Office to

procure jail recordings of certain individuals that they believed may be useful to their investigations. (Docket No. 686 at 50-1).

William Fielder was arrested on October 14, 2011 after a traffic incident and charged with driving under the influence and a host of other related offenses.[2] (Def. Ex. A). Fielder was on parole at the time following his release from incarceration on a homicide conviction. (Docket No. 686 at 60). He was incarcerated at the ACJ on the DUI and other charges as well as the corresponding parole violation. (*Id.*). Detective Harpster requested that his colleague Detective Kavals contact the Allegheny County District Attorney's Office to obtain Fielder's jail calls for use in their drug investigation. (Docket No. 686 at 50-1, 63-4). He testified that the detectives wanted to obtain the jail calls so that they could listen to them and determine if there was any communication between Fielder and other members of the organization that would further their drug investigation. (*Id*. at 50-1). Detective Harpster admitted that the subpoenaed recordings had nothing to do with Fielder's DUI case, that there were no drug charges against Fielder at that time, that he had no direct evidence of Fielder's involvement in drug trafficking and that the recorded calls were not being requested for any pending hearing. (*Id*. at 56-7, 59). He added that the U.S. Attorney's Office was not consulted regarding the subpoenas. (*Id*. at 64).

---

[2]     Based on the state docket report, Fielder was charged with all of the following violations:

- DUI: Highest rate of alcohol (BAC .16+) 2nd offense; M1, 75 P.S. § 3802 §§ C
- DUI: Gen Imp/Inc of Driving Safely – 1st offense; M 75 P.S. § 3802 §§ A1
- DUI: Gen Imp/inc of driving safely – 1st off; M 75 P.S. § 3802 §§ A1
- Driving with licenses suspended/revoked pursuant to section 3802; 2 75 P.S. § 1543, §§ B1 (dismissed)
- Unauthorized use of motor/other vehicles; M2, 18 P.S. § 3928 §§ A (dismissed)
- Driving without a license; S 75 P.S. 1501 §§ A (dismissed)
- Accidental damage to unattended vehicle or property; S 75 P.S. § 3745 §§ A). (dismissed)

(Def. Ex. A).

ADA Broman recalled that Detective Kavals contacted him for the purpose of obtaining Fielder's jail recordings and that he fulfilled this type of request on two separate occasions. (Docket No. 686 at 22-3, 54-5; Def. Exs. B, D).  He conceded that he was not involved in the prosecution of the DUI case against Fielder.  (Docket No. 686 at 21).  ADA Broman testified that he believed that the detectives could have procured the jail recordings from the jail on their own and he was simply providing a "service" to them because he was under the impression that Detective Kavals had "no idea" how to obtain the jail recordings at the time.  (*Id.* at 33, 39).  Although he admitted that he was not told of the specific purpose for the procurement of the jail calls, ADA Broman denied that Detective Kavals had an improper purpose for this request as his understanding was that jail calls could be obtained by law enforcement officers in furtherance of any criminal investigation.  (*Id.* at 39).  He also had no reason to doubt that Detective Kavals was obtaining the calls for a drug investigation as he knew him to be a narcotics detective and had worked with him in the past on drug cases.  (*Id.* at 39-40).

ADA Broman explained that he utilized subpoenas to request the jail recordings because he was not aware of the specific procedures required by the ACJ.  (*Id.* at 24, 39).  He used the subpoena procedure in other instances as well until he was told by a supervisor that it was unnecessary at some point after the events of this case.  (*Id.*).  Around the same time, he was also advised that he should use a standard form letter to request jail recordings and to submit same to the Deputy Warden at the ACJ in charge of those matters going forward– a practice he has since adopted.  (*Id.* at 24).

The ACJ responded to the subpoenas by providing ADA Broman all of Fielder's recorded jail calls for the requested periods, i.e., from October 14, 2011 through the initial production due on November 1, 2011, and from November 23, 2011 through December 31,

2011.[3] (Def. Exs. B, D). ADA Broman did not listen to any of the jail recordings. Rather, the detectives picked up the jail calls and listened to all of these recordings themselves. (Docket No. 686 at 67-8). Detective Harpster explained that at the outset of every call is a "loud and clear" automated message advising the participants on the call that "this call is from a correctional facility and is subject to monitoring and recording." (*Id*. at 61). He added that inmates are provided notice that all jail calls are recorded as part of their orientation packages and that stickers are placed on the phones advising inmates of the recordings. (*Id.* at 62). Detective Harpster also indicated that Fielder acknowledged his understanding that the calls were being recorded during several of the monitored conversations, including making comments such as: "you got to be careful what you say on this phone"; and, "they are monitoring these phones all day every day." (*Id.*).

Fielder was transferred to SCI-Greensburg around January of 2012. (Docket No. 686 at 13). Despite the transfer, the detectives remained interested in listening to Fielder's jail recordings. (*Id.* at 53-4). Given same, Detective Harpster then filled out a DEA administrative subpoena to obtain the jail recordings from SCI-Greensburg, requesting that his calls be provided to the agents on a weekly basis starting on February 1, 2012. (Def. Ex. C; Docket No. 686 at 53-4). At the time of the issuance of the DEA administrative subpoena, neither Harpster nor Kavals had ever procured jail recordings from a state correctional institution. (Docket No. 686 at 64). After asking around with other Task Force Officers, they were advised that the calls could be obtained through the submission of a DEA subpoena to the facility. (*Id.* at 64-5). This particular administrative subpoena form was utilized despite the title of same and the fact that there were no ongoing administrative proceedings at the time of the request. (*Id.* at 53, 56-7). There were

_____

[3] The Court notes that the subpoenas also requested jail visitation logs pertaining to any of Fielder's visits. (Def. Exs. B, D). It is unclear if visitation logs were produced but it is of no moment as the production of the visitation logs is not challenged here.

still no drug charges against Fielder, and consequently, there were no hearings scheduled. (*Id.* at 56-7). Like the ACJ calls, the jail recordings from SCI-Greensburg were procured by the detectives to further the drug investigation. (Def. Ex. C).

SCI-Greensburg also complied with the subpoenas and provided the recordings to the DEA, as requested. (Docket No. 686 at 61). Detective Harpster listened to these recordings as well. (*Id.*). He advised that SCI-Greensburg also employs a "loud and clear" notification at the outset of inmate calls stating that "this call will be recorded and monitored" and at "least two other times during a 15-minute call it will break into the call and will repeat this call is from the State Correctional Institution of Greensburg and is subject to monitoring and recording." (*Id.* at 62). Detective Harpster's investigation also revealed that SCI-Greensburg advises inmates that their calls are recorded through its inmate orientation packets and notices near the telephones. (*Id.* at 63).

The content of the jail recordings was utilized by Detective Harpster in his affidavits supporting five Title III applications, extensions and/or spin-offs, seeking the authorization to intercept communications on six separate cell phones at various times between February and June 2012 which were submitted as part of a federal investigation and approved by District Judges sitting on this Court. (*See* Govt. Ex. 1[4]). As a whole, the five separate applications, supporting affidavits and resulting judicial Orders are extensive, consisting of at least 545 pages of text. (*See id.*). Relevant here, five of the cell phones were used by co-defendant Jamell Anderson, i.e., target telephones ("TT"), 1, 2, 4, 5, and 6. (*Id.*). The other phone, TT3, was used by Ewell. *See* Misc. Nos. 12-58(a) and 12-58(b). The communications on Ewell's TT3 were intercepted during March and April of 2012 after the Government obtained judicial authorization

---

[4] Although the documents were not marked in this manner, for convenience, the Court cites to the Government's sealed disk containing the wiretap applications and orders from Misc. Nos. 12-58, 12-58(a), 12-58(b), 12-58(c) and 12-58(d) as Govt. Ex. 1.

for same through the approval of its second and third Title III applications. (*Id.*). The first, fourth and fifth Title III applications authorized the interception of Jamell Anderson's cell phone communications only during February, May and June of 2012, and given his guilty pleas, the same is not challenged here. *See* Govt. Ex. 1, Misc. Nos. 12-58, 12-58(c) and 12-58(d). The DEA utilized its McKees Rocks, Pennsylvania office to intercept, monitor and record the communications over the target telephones throughout this entire period. (Docket Nos. 576; 696 at 4).

The information contained within the affidavits sets forth in detail the multiple arrests, seizures and interdictions by law enforcement that took place during this investigation, some of which are chronologically detailed as follows.

- May 2011 – CS#3 made a controlled purchase of 10 stamp bags of heroin from John Lee Payne as set up by Lloyd Irish.

- June 2011 – CS#3 made a controlled purchase of 15 bricks of heroin from Khalid Kareem. William Fielder was present during this transaction. CS#3 reportedly had a short conversation with Fielder where Fielder allegedly "expressed how adamant he was about not going back to jail," and which CS#3 interpreted as a threat to prevent him from cooperating with law enforcement officers if he was apprehended.

- July 6, 2011 – Lloyd Irish was arrested with 4,460 stamp bags of heroin, ecstasy pills, marijuana and $1,444.00 in U.S. currency. He was also observed discarding a pistol that was not recovered.

- August 7, 2011 – Lloyd Irish was stopped driving a vehicle which was searched, and $149,797.00 was seized from the trunk of the car.

- September 2011 – CS#3 made a controlled purchase of 10 bricks of heroin from Kareem.

- October 2011 – CS#3 made a controlled purchase of 15 bricks of heroin from Kareem.

- November 2011 – CS#3 made a controlled purchase of 10 bricks of heroin from Jamell Anderson.

- November 21, 2011 – Law enforcement seized $490,000.00 from the residence of Ashley Parker in the Pittsburgh area. The money was placed at her residence by Donnell Morris because he became suspicious after seeing a white man around the stash house that he and his brother Donnie Morris were using to hide the cash generated by the heroin conspiracy. After this seizure, Fielder was recorded discussing same with an unidentified friend of Jamell Anderson, telling him to "stay low, stay away from those weird niggas."

(Govt. Ex. 1, Misc. No. 12-58, 1/31/12 Affidavit).

- February 9, 2012 – Andrew "Red" Anderson was arrested by the Pennsylvania State Police and City of Pittsburgh Police and charged with heroin trafficking and heroin possession. He was pulled over at a traffic stop and 50 bricks of heroin were recovered. Execution of a search warrant at his house resulted in the seizure of $6,600.00.

- March 6, 2012 – Jamell Anderson was pulled over on the parkway east during a traffic stop. The vehicle he was driving was searched and 150 bricks of heroin were seized from the backseat of the car. He was arrested and made bail. He and Derrick Samuels then conspired to try to influence Magisterial District Judge Kim Hoots through her husband, Robert, to dismiss the charges at a preliminary hearing in state court. Their efforts were unsuccessful.

(Govt. Ex. 1, Misc. Nos. 12-58(a), 2/29/12 Affidavit, 12-58(b), 3/23/12 Affidavit).

- March 6, 2012 – The grand jury indicted Lloyd Irish, charging him with drug and firearms offenses arising from the July, 2011 incident.

(Crim. No. 12-48, Docket No. 3).

- May 21, 2012 – Amanda O'Kelley and Derrick Samuels were pulled over by a state trooper on I-99 around Altoona in a rental car that neither were authorized to drive. Law enforcement recovered 2,000 bricks of heroin from the trunk of the rental car.

(Govt. Ex. 1, Misc. No. 12-58(d)).

Ultimately, on June 28, 2012, the DEA broke up a transaction between Mario Osoria, Danilda Osoria and Jamell Anderson in New York. (Crim. No. 12-200, Docket No. 1). The DEA seized $200,000.00 from Anderson and 2,000 bricks of heroin from Mario Osoria. (*Id.*). The wire taps were taken down after these seizures.

*B. Relevant Procedural Background*

The grand jury returned an Indictment in Criminal No. 13-125 against Ewell, Fielder, Canaan Bey, Terrious Harper, Khalid Kareem, Donnell Morris, Donnie Morris and Brandon Thompson on April 30, 2013.[5] (Docket No. 1). This Indictment charged a conspiracy to distribute more than one kilogram of heroin from in or around January 2011 to in or around June 2012. (*Id.*). A Superseding Indictment was returned on July 23, 2013, expanding the time period of the conspiracy from January 2011 to May 2013, and adding Frank Currington, and Tyrell Herbert as Defendants. (Docket No. 141). Except for Ewell and Fielder, all of the defendants charged at Criminal No. 13-125 have pled guilty.

The cases against Ewell and Fielder have been pending for some time in large part due to numerous requests for extensions and continuances by Defendants and, in particular, the changes of counsel by Ewell, who is now represented by his sixth attorney. (*See* Docket Nos. 47, 48, 120, 121, 128, 129, 196, 197, 228, 230, 262, 264, 265, 268, 310, 311, 322, 323, 374, 375, 386, 387, 410, 414, 422, 424, 438, 460, 461, 501-04, 535, 536, 540, 593, 595). Given the circumstances, the Court has deemed all of these delays excludable under the Speedy Trial Act,

---

[5]     The grand jury returned an Indictment against Lloyd Irish on March 6, 2012 at Criminal Number 12-48. He pled guilty and was sentenced on July 22, 2013, at which time his case was closed. (Crim. No. 48 at 67, 67). Criminal Number 12-200 was initiated on June 28, 2012, with a criminal complaint being filed against Jamell Anderson, Danilda Osoria and Mario Osoria after their respective arrests. (Crim. No. 12-200, Docket No. 1). The grand jury then returned an Indictment against Anderson, the Osorias, Andrew Anderson, Amanda O'Kelley, Lori Page, Derrick Samuels, and Ricco Sears on July 24, 2012. (Docket No. 24). This Indictment charged a conspiracy to distribute one kilogram or more of heroin for the period of October 2011 to on or about June 28, 2012. (*Id.*). All of the defendants in Criminal No. 12-200 have pled guilty at various times and that case has been closed for some time. Ricco Sears was also indicted separately at Criminal Number 12-309 and he pled guilty to charges in that indictment as well.

18 U.S.C. § 3161 *et seq.*, as is indicated in the Court's many Orders granting such extensions and continuances. (*See id.*).

With respect to the pending motions, Ewell filed his Motion to Suppress Title III Intercepts and Brief in Support on October 21, 2014. (Docket No. 491, 492). The Government filed its Omnibus Response addressing this submission and several other motions filed by Ewell and Fielder on February 21, 2015. (Docket No. 576). The Government also presented a supporting exhibit consisting of the wire applications, affidavits and authorizations filed at Misc. Nos. 12-58, 12-58(a), 12-58(b), 12-58(c) and 12-58(d). (Govt. Ex. 1). The deadline for Ewell's submission of a Reply Brief was extended several times due to a subsequent change of counsel made at Ewell's request which resulted in his third attorney whom he retained, Daniel Konciezca, Esquire withdrawing and Stephen Israel, Esquire being appointed under the Criminal Justice Act to represent him. (Docket Nos. 591, 593, 595, 599, 600).

The Court initially set the matter for a hearing on July 13, 2015. (Docket No. 607). In advance of the hearing, Fielder filed a Motion to Quash Subpoenas on June 24, 2015. (Docket No. 623). The Government filed its Response to same on June 30, 2015. (Docket No. 630). The Court granted Ewell's Motion to Join Fielder's Motion to Quash on July 2, 2015. (Docket No. 636). Fielder then filed a Reply Brief in support of his Motion to Quash on July 8, 2015. (Docket No. 649).

Days before the scheduled hearing, on July 7, 2015, attorney Edward Levicoff, Esquire entered his appearance and filed a motion for the admission of attorney Brian McDaniel, Esquire to appear *pro hac vice* on behalf of Ewell, which the Court granted. (Docket Nos. 639-641). Thereafter Attorney Israel was granted leave to withdraw. (Docket No. 651). The Court also granted a continuance of the scheduled hearing and after conferring with counsel, ultimately set

the matter for a hearing on October 30, 2015. (Docket No. 658). In advance of the hearing, through his counsel, Ewell filed a Supplement in support of his Motion to Suppress Title III intercepts on October 23, 2015, attaching several line sheets providing the text of the intercepted calls. (Docket No. 669).

The Court held a motion hearing on October 30, 2015. (Docket No. 679). At the hearing, the parties presented evidence as to Fielder's Motion to Quash and counsel for Ewell presented oral argument in support of his Motion to Suppress, the Government having been granted leave to respond in writing in a post-hearing submission. (Docket No. 679, 686). The Court ordered production of the transcript of the portion of the proceedings as to Fielder's Motion which was filed on November 18, 2015. (Docket No. 686). The Government filed its supplemental response as to Ewell's Motion on November 11, 2015. (Docket No. 682). Ewell then submitted a reply on December 18, 2015. (Docket No. 696). Finally, the Government declined to file a sur-reply brief by the Court's deadline of January 4, 2016. (*See* Docket No. 691).

The post-hearing submissions on Fielder's Motion were as follows. Fielder filed a supplemental brief on December 4, 2015. (Docket No. 689). Ewell did not make a separate filing despite his joinder in the motion. The Government submitted its response on December 12, 2015. (Docket No. 695). Neither Ewell nor Fielder filed a motion requesting leave of court to submit any further briefing by the Court's January 8, 2016 deadline. (Docket No. 681). As all briefing has finally concluded and the Court's deadlines have expired, the Court took the pending motions under advisement as of January 9, 2016 and they are now ripe for disposition.

III.    LEGAL STANDARD

At a hearing on pretrial motions, it is the duty of the trial judge to assess witness credibility and determine the weight to be given the evidence, together with any inferences, deductions and conclusions to be drawn therefrom. *Richardson*, 501 F. Supp. 2d at 734. The Court's factual findings are made based on the preponderance of the evidence. *Id.*

IV.    DISCUSSION

As noted, Fielder has moved to quash the subpoenas issued to correctional institutions to produce recordings of his jail calls to law enforcement and Ewell has moved to suppress the Title III authorized interceptions of communications on his cell phone. (Docket Nos. 491, 623). The Government opposes both motions.[6] (Docket Nos. 576, 630). The Court will evaluate the pending motions chronologically, starting with Fielder's Motion to Quash, which has been joined by Ewell, and challenges the Government's acquisition of his recorded jail conversations from October of 2011 through February of 2012 and then move on to Ewell's Motion to Suppress contesting the authorized Title III wire interceptions of communications over his TT3 in March and April of 2012.

A. *Fielder's Motion to Quash – Joined by Ewell*

---

[6]    At the outset, the Court notes that the Government has objected to the timeliness of certain submissions made by Ewell and Fielder and accused Defendants of violating the Court's various orders setting deadlines for the submission of pretrial motions, reply briefs and other matters. (Docket Nos. 630, 682, 695). Despite these arguments, the Government has addressed, in detail, the merits of their positions with respect to these motions. (*Id.*). Given this posture, and finding that the Government has presented no evidence of it having sustained any prejudice by the alleged deficiencies, the Court will address the merits of Defendants' Motions which the Court finds should be denied in any event. *See United States v. Staton*, 605 F. App'x 110, 113 (3d Cir. 2015) (quoting *United States v. Rose*, 538 F.3d 175, 181 (3d Cir. 2008) and citing Fed. R. Crim. P. 12(b)(3)(C), (c)(1)) ("'if a party does not meet the deadline for [making a motion to suppress], the motion is untimely' and deemed waived absent a showing of 'good cause' by the party.").

Fielder moves to quash three subpoenas that were issued to correctional institutions directing such entities to provide his recorded jail calls to law enforcement for periods of time while he was in custody of the ACJ in the fall of 2011 and later incarcerated at SCI-Greensburg in early 2012. (Docket Nos. 623, 649, 689). Ewell has joined this motion to the extent that it applies to him.[7] (Docket No. 636). Fielder claims that the three subpoenas were issued in violation of Rule 17 of the Federal Rules of Criminal Procedure as their issuance for pretrial discovery purposes constituted an improper "fishing expedition." (Docket Nos. 623, 649, 689). He continues that the law enforcement officers committed an abuse of process as they lacked any articulable facts supporting the request for the subpoenas to investigate any drug dealing as he was detained on unrelated DUI charges and parole violations. (*Id.*). The Government opposes such motion, arguing that Rule 17 does not apply to the subpoenas and that Fielder lacked any reasonable expectation of privacy in the jail calls such that they should not be excluded from trial. (Docket Nos. 630, 695).

In this Court's estimation, Rule 17 is inapplicable to the pre-indictment subpoenas served on the ACJ and SCI-Greensburg seeking Fielder's recorded jail calls. As a general matter, judicial approval is required for the issuance of a Rule 17(c) subpoena *duces tecum*, upon a showing by the proponent:

---

[7]     Along with Ewell's joinder motion, he also filed a series of search warrants issued by Magistrate Judge Mitchell in the summer of 2012 that he believes are also subject to the Rule 17 arguments made by Fielder. (*See* Docket No. 633). Of course, search warrants are not covered by Rule 17 and the warrants that are attached refer to cell phones that were confiscated from the codefendants charged at Criminal Number 12-200, Jamell Anderson, *et al.*, upon their respective arrests. (*Id.*). Ewell lacks standing to raise Fourth Amendment challenges to these searches and seizures because he does not have a reasonable expectation of privacy in the cell phones of third parties. *See United States v. Solomon*, 2007 WL 927960 (W.D. Pa. Mar. 26, 2007) ("Defendant Solomon requests the Court to suppress records seized pursuant to a search warrant for subscriber information and detailed call records for Cricket Communications Phone Number 724-xxx-xxxx. The Court will summarily deny this request as Defendant has alleged no set of facts which establish that he had a possessory interest or a legitimate expectation of privacy in this particular cellular telephone number. The subject cellular telephone number was not registered in Defendant Solomon's name, nor was he listed as an authorized user of the telephone. Rather, the subscriber of the phone is listed as Anthony Carter."). Ewell likewise did not have a reasonable expectation of privacy in the recorded jail calls for the same reasons set forth herein as to Fielder.

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

*United States v. Nixon*, 418 U.S. 683, 699–700 (1974); *see also United States v. Kubini*, Crim. No. 11-14, 2013 WL 5963392, at *1 (W.D. Pa. Nov. 7, 2013) (quoting same). However, Rule 17 only governs subpoenas issued under the seal of this Court and signed by the Clerk of Court. *See* FED. R. CRIM. P. 17(a) ("A subpoena must state the court's name and the title of the proceeding, including the seal of the court … The clerk must issue a … signed and sealed [subpoena]."); *see also United States v. Phibbs*, 999 F.2d 1053, 1077 n. 8 (6th Cir. 1993) (noting that an administrative subpoena is "distinct from Rule 17(c) of the Federal Rules of Criminal Procedure"). Here, the two subpoenas served on the ACJ were issued by the Court of Common Pleas of Allegheny County and the third subpoena served on SCI-Greensburg was a DEA administrative subpoena issued by the agency as authorized under 21 U.S.C. § 876(a). (Def. Exs. B, C, D). Neither this Court nor its Clerk of Court had any role in the issuance of the subpoenas. Hence, the articulated standard for the issuance of a Rule 17(c) subpoena *duces tecum* requiring judicial approval and precluding the issuance of a same without the proponent showing that the request was made in good faith rather than a fishing expedition casting a wide net in the hope of finding something useful, is not controlling. *See United States v. Eisenhart*, 43 F. App'x 500, 505 (3d Cir. 2002) (commenting that such a fishing expedition is a request based upon only unspecific "subjective belief (i.e., hope) that [the proponent] may find something useful by a casting a subpoena upon the waters").

As to the state court subpoenas issued to the ACJ, it is well established "that federal district courts will decide evidence questions in federal criminal cases on the basis of federal, rather than state, law." *United States v. Williams*, 124 F.3d 411, 428 (3d Cir. 1997) (quoting *United States v. Rickus*, 737 F.2d 360, 363 (3d Cir.1984)); *see also Virginia v. Moore*, 553 U.S. 164, 178, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008) ("[i]t is not the province of the Fourth Amendment to enforce state law."). Therefore, the alleged violation of Pennsylvania Rule of Criminal Procedure 107, which Fielder contends embodies similar requirements to its federal counterpart, Rule 17, and additionally forbids the issuance of a subpoena without a scheduled hearing, cannot serve as the basis for this Court to quash the subpoenas nor the corresponding request to exclude the evidence obtained therefrom in these federal proceedings. *Id.*

In addition, this Court's review of the Pennsylvania Wiretap Act, 18 Pa. Cons. Stat. Ann. § 5704 (West), confirms the Government's position in this case – as ADA Broman testified – that a subpoena was not required to obtain the jail recordings from either the ACJ or SCI-Greensburg. To this end, sections 5704(13) and (14) contain very similar provisions authorizing state and county correctional facilities to intercept telephone communications of inmates if notice of the recording is provided to the inmates and permitting the correctional facilities to disclose the recorded conversations to law enforcement officers for the prosecution and investigation of any crime. 18 Pa. Cons. Stat. Ann. §§ 5704(13)(i)(A)-(C), (14)(i)(A)-(C). This interpretation has been upheld by the Supreme Court of Pennsylvania in *Commonwealth v. Baumhammers*, 599 Pa. 1, 33-34, 960 A.2d 59, 79 (2008), which rejected the Appellant's claim that a recorded jail call he had with his parents while in presentence custody should have been suppressed rather than provided to a detective and a state psychiatric expert and presented at trial. In reaching this decision, the Supreme Court found that the plain language of the statute authorized disclosure of

the recorded conversation to law enforcement in connection with the "prosecution or investigation of **any** crime." *Id.* at 33-4 (emphasis added). All told, under Pennsylvania law, law enforcement officers are able to obtain properly recorded jail calls without Court authorization and they may be used for the broad purpose of investigating any crime. *Id.*

The credible facts before this Court demonstrate that the subpoena form was used by ADA Broman as a matter of convenience and was simply unnecessary under state procedures. (Docket No. 686 at 24). As he further explained, jail recordings can be obtained by law enforcement officers through the submission of a letter making such a request directly to the Deputy Warden in charge of such matters. (*Id.*). Beyond this, the Court also finds that Detective Harpster provided a credible and forthright account of the reasons the detectives obtained the jail calls, i.e., to further the investigation of the Larimer Drug Trafficking Organization of which he believed Fielder was a high ranking member. (*Id.* at 50-1; 56-7; 59; 63-4). The fact that Fielder was detained on unrelated DUI charges and a corresponding parole violation does not undermine the finding that the jail calls were requested for a lawful purpose to investigate his involvement in drug trafficking which falls within the broad category of "any crime," as authorized by the statute. *See* 18 Pa.C.S. §§ 5704(13), 5704(14).

With respect to the administrative subpoena issued by Detective Harpster in his capacity as a DEA Task Force Officer, 21 U.S.C. § 876(a) provides that the Attorney General or designee has authority to "require the production of any records (including books, papers, documents, and other tangible things which constitute or contain evidence) which the Attorney General finds relevant or material to the investigation" of a violation of the Controlled Substances Act. 21 U.S.C. § 876(a). This statute grants the DEA "broad powers to investigate violations of federal drug laws. [However], [t]he statute provides no express right to challenge the Attorney

General's subpoenas issued under it." *United States v. Moffet*, 84 F.3d 1291, 1293 (10th Cir. 1996). Absent such statutory authority, "the supervisory power does not authorize a federal court to suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court." *United States v. Payner*, 447 U.S. 727, 736 (1980). Thus, the alleged seizure must violate the defendant's own constitutional rights protected by the Fourth Amendment to warrant exclusion. *Id.* at 731 ("a court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search and seizure violated the defendant's own constitutional rights.").

In another criminal matter, Chief Judge Conti denied a motion to suppress jail recordings obtained from correctional institutions via this type of subpoena, reasoning that:

> [w]hen DEA administrative subpoenas are issued to third parties pursuant to § 876(a), courts have held defendants lack standing to dispute their issuance. *See, e.g., United States v. Plunk*, 153 F.3d 1011, 1020 (9th Cir. 1998) (defendant lacked standing to challenge subpoenas of telephone records issued to third-party businesses because the subpoenas were not directed at the defendant), *amended by* 161 F.3d 1195 (9th Cir. 1998), *abrogated on other grounds by United States v. Hankey*, 203 F.3d 1160, 1169 n. 7 (9th Cir. 2000); *United States v. Phibbs*, 999 F.2d 1053, 1077 (6th Cir. 1993) (credit card statements and telephone records); *United States v. Mountain States Tel. & Tel. Co., Inc.*, 516 F. Supp. 225, 231 (D. Wyo. 1981) (toll records); *United States v. Key*, 09–179, 2010 WL 3463756, at * 1 (W.D. Ky. Sept. 1, 2010) (airline passenger records); *see also Payner*, 447 U.S. at 732 (respondent lacked standing to suppress bank records illegally seized from a third party).
>
> A defendant demonstrates standing to challenge administrative subpoenas issued to third parties when he can show "a legitimate expectation of privacy attaching to the records obtained." *Phibbs*, 999 F.2d at 1077.

*United States v. Thompson*, Crim. No. 07-303, 2010 WL 4641663, at *14-15 (W.D. Pa. Nov. 8, 2010) (Conti, J.) *aff'd in part, vacated in part, remanded sub nom. United States v. Thompson*,

772 F.3d 752 (3d Cir. 2014). In light of this precedent, the Court believes that the same principles would preclude the challenges to the state court issued subpoenas, if they were appropriately before the Court.

The United States Court of Appeals for the Third Circuit has held that inmates, and the people with whom they confer over monitored jail telephones, lack an objectively reasonable expectation of privacy in recorded jail calls where the facts showed that they were aware that the calls were monitored and recorded, evidencing that the inmate impliedly consented to same through his use of the jail phones. *See e.g.*, *United States v. Shavers*, 693 F.3d 363, 389-90 (3d Cir. 2012), *cert. granted, judgment vacated on other grounds*, 133 S. Ct. 2877, 186 L. Ed. 2d 902 (2013); *United States v. Hodge*, 85 F. App'x. 278, 281 (3d Cir. 2003) (defendant impliedly consented to taping of phone conversations he made from jail where every call was preceded by message warning caller that call would be recorded and monitored). Similarly, District Courts have denied suppression motions challenging the admissibility of jail calls in cases before them, holding that the inmates lacked an objectively reasonable expectation of privacy in the recorded calls. *See United States v. Akinola,* Crim. No. 11-310 JLL, 2013 WL 1103702, at *14 (D.N.J. Mar. 15, 2013) ("Courts have consistently held that detainees lack an objectively reasonable expectation of privacy in phone calls made from prisons or jails."). Several District Judges sitting on this Bench have reached the same conclusion. *See e.g., United States v. Korbe*, 2010 WL 2776337, at *8 (W.D. Pa. July 14, 2010) (McVerry, J.); *United States v. Solomon*, 2007 WL 927960, at *3 (W.D. Pa. Mar. 26, 2007) (McVerry, J.); *United States v. Colbert*, 2011 WL 3360112, at *6-8 (W.D. Pa. Aug. 3, 2011) (Diamond, J.); *United States v. Morris*, 2008 WL 5188826 (W.D. Pa. Dec. 8, 2008) (Gibson, J); *United States v. DeMelio*, Crim. No. 05-15, Docket No. 22 (W.D. Pa. Aug. 16, 2005) (Schwab, J.).

This Court is not persuaded that the facts of this case require a departure from the above authority. Indeed, neither Fielder nor Ewell have presented any evidence countering the Government's well-supported assertion that Fielder was aware that the telephone conversations on the jail phones were being monitored and recorded and thus impliedly consented to same by using the phones. (Docket Nos. 492, 669, 686, 696). All of the following was established during Detective Harpster's testimony as well as contained in his affidavits: inmates receive notice that calls on jail phones are recorded in their orientation packets for both the ACJ and SCI-Greensburg; notices are posted at the jails advising inmates of same; a recorded message is played at the outset of each call from these institutions advising the participants that the call is being recorded; and, the automated message is repeated at least 2 more times during the SCI-Greensburg calls. (Docket No. 686 at 61-3). Detective Harpster also advised that Fielder made comments at various times indicating that he was aware of the recordings. (*Id.* at 62 (testifying that Fielder commented during the calls that "you got to be careful what you say on this phone"; and, "they are monitoring these phones all day every day."); Govt. Ex. 1 at 21-22; 1/31/12 Affidavit). Ewell was aware that Fielder was incarcerated and had served time in prison himself such that he should have been aware that the calls were being recorded. *See Hodge*, 693 F.3d at 389-90. Given same, the Court holds that neither Fielder nor Ewell had a reasonable expectation of privacy in the recorded jail conversations.

Based on the foregoing, Fielder's Motion to Quash Subpoenas [623], joined by Ewell, is DENIED.

### B. *Ewell's Motion to Suppress Title III Interceptions*

Ewell seeks to suppress the evidence recovered by the Government through its authorized wiretap applications of his TT3 during March and April of 2012, arguing that:

> (1) the applications failed to sufficiently demonstrate that the wiretaps were necessary ("necessity claim");
>
> (2) the United States District Court Judges in this district did not have jurisdiction to authorize the interception of communications over his TT3 if he was residing in North Carolina at the time ("jurisdiction claim");
>
> (3) the monitoring agents failed to properly minimize certain intercepted communications ("minimization claim"); and
>
> (4) the affidavits that were submitted in support of the applications for TT3 contained material misrepresentations ("Franks claim").

(Docket Nos. 492, 669, 696). The Government counters that the extensive applications and affidavits more than suffice to demonstrate that the investigation was proper and that each of the above claims are without merit. (Docket Nos. 576, 682).

> Pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq., wire, oral, and electronic communications may be intercepted by law enforcement on a showing that there is probable cause that (1) an individual is committing a particular offense; (2) that relevant communications will be obtained through the interception; and (3) that the premises where the interception will be made are being used in connection with the charged offense. 18 U.S.C. § 2518(3). In addition, a wiretap application must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* § 2518(1)(c). Thus, in order to lawfully grant an application for a wiretap, the issuing judge must find a wiretap to be necessary, which requires that the application explain why "normal investigative techniques would be of no avail." *United States v. Hendricks*, 395 F.3d 173, 180 (3d Cir. 2005) (internal quotation marks and citation omitted).

*United States v. Garvey*, 588 F. App'x 184, 190 (3d Cir. 2014). "When a warrant is later challenged, a deferential standard of review is applied in determining whether the issuing judge had a 'substantial basis' for issuing the warrant." *United States v. Gilliam*, No. 02:12-CR-93, 2015 WL 5178197, at *14 (W.D. Pa. Sept. 4, 2015) (citing *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir.1993); *Illinois v. Gates*, 462 U.S. 213, 237 (1983)). Further, when a motion

challenges the four corners of an affidavit and application, an evidentiary hearing is not required. *Id.* at * 14.

1.   Necessity Claim

Ewell first argues that the affidavits supporting the wiretap authorizations fail to meet the necessity requirements of the wiretap statute.  (Docket Nos. 492, 669, 696).  Ewell claims that "[i]t is submitted that traditional investigative techniques were not utilized or proven to be ineffectual as to Mr. Ewell and therefore, the wire intercepts authorized under the filing 12-58(a) lack the requisite showing for necessity and should be suppressed.  Mr. Ewell respectfully submits that the affidavits presented in support of the wire intercepts acquired during the investigation leading to the aforementioned indictments lack the requisite showing of necessity and should be suppressed."  (Docket No. 492).  Ewell also suggests that the wiretap was unnecessary because the officers could have utilized other investigative techniques, such as using confidential informants to make consensually recorded calls.  (Docket No. 669).  The Government counters that Ewell's necessity claim must fail.  (Docket Nos. 576, 682).

The applicable statute outlines that an application for Title III interceptions must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(c)(1).  A District Judge may authorize the wiretap upon a demonstration that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(c)(3).  The Court of Appeals has made clear that "18 U.S.C. § 2518(3)(c) does not require the government to exhaust all other investigative procedures before resorting to electronic

surveillance." *United States v. Williams*, 124 F.3d 411, 418 (3d Cir. 1997); *see also United States v. Rivera*, 532 F. App'x 304 (3d Cir. 2013) (quoting same).

> "The government need only lay a 'factual predicate' sufficient to inform the judge why other methods of investigation are not sufficient." *United States v. McGlory*, 968 F.2d 309, 345 (3d Cir. 1992) (quoting *United States v. Armocida*, 515 F.2d 29, 38 (3d Cir. 1975), *cert. denied sub nom., Conti v. United States*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975)); *cert. denied sub nom., Hauser v. United States*, 506 U.S. 956, 113 S.Ct. 415, 121 L.Ed.2d 339 (1992). Furthermore, in determining whether this requirement has been satisfied, a court "may properly take into account affirmations which are founded in part upon the experience of specially trained agents." *United States v. Ashley*, 876 F.2d 1069, 1072 (1st Cir. 1989); *see also United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977), *cert. denied*, 434 U.S. 855, 98 S.Ct. 174, 54 L.Ed.2d 126 (1977). "The government's showing is to be 'tested in a practical and commonsense fashion.'" *McGlory*, 968 F.2d at 345 (quoting *United States v. Vento*, 533 F.2d 838, 849 (3d Cir. 1976))

*Williams*, 124 F.3d at 418.

In *Rivera*, the Third Circuit upheld the affidavits as satisfying the necessity prong, holding that:

> The affidavit reflected that, despite employing several traditional investigative methods during the course of the investigation, including the use of informants, cooperating defendants, physical surveillance, and the use of pen register and telephone toll records, investigators of the drug trafficking organization were unable to obtain certain vital information about the conspiracy such as its scope and the precise roles of all co-conspirators involved. The affidavit also demonstrated that the use of undercover agents was too dangerous and that the execution of a search warrant would have prompted the suspension of distribution activities and impeded collecting evidence. Furthermore, the utility of other methods of investigation to obtain some information does not foreclose the possibility that a wiretap is necessary to obtain other information.

*United States v. Rivera*, 532 F. App'x 304, 306 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 327, 187 L. Ed. 2d 230 (2013). Similarly, in *Garvey*, the Third Circuit set forth the following explanation:

> The affidavit was prepared in detail, recounting several examples of investigative methods that were or could be attempted and why those methods were or would be ineffective. In the affidavit, Semrick described the physical surveillance of Garvey and his associates, a prior search of Garvey's residence, the use of administrative subpoenas of email and cellular phone accounts, the attempted use of a GPS tracker, the monitoring of pen registers and toll records, interviews with Garvey's associates, and the use of confidential informants and an undercover agent. He also explained why those techniques had limited success and why others that were not tried would not be successful. We have no difficulty concluding that the District Court did not abuse its discretion in determining that the affidavit supported a finding of necessity.

*United States v. Garvey*, 588 F. App'x 184, 191 (3d Cir. 2014).

The Government points out that its supporting affidavits clearly set forth that the overarching goal of the investigation was to dismantle the entirety of the Larimer Drug Trafficking Organization. (*See* Govt. Ex. 1 at 134, Misc. No. 12-58(a), Affidavit 2/29/12) ("The goal of this investigation is to dismantle the entire [Larimer] Organization through the acquisition of sufficient credible evidence to prove beyond a reasonable doubt the full scope of the Larimar Organization's criminal activities and membership."). The investigation sought to demonstrate that the defendants and their co-conspirators were committing violations of 21 U.S.C. §§ 841(a)(1) (distribution of controlled substances); 843(b) (use of communication facility to commit drug trafficking crimes); 846 (conspiracy); and 18 U.S.C. §§ 922 (possession of firearms); 924 (possession of firearms in furtherance of drug trafficking); 1956 and 1957 (money laundering). *Id.* at 137. Another purpose of the wiretaps was to locate all members of the conspiracy including those ranging from the supply sources of heroin to the couriers at the bottom of the organization and those that were used to hold property (such as drug proceeds) for the organization. *Id.* at 134 ("To accomplish this goal, all of the members of the Organization and their roles must be identified. In addition, the precise manner in which they operate must be

determined; and their sources of supply, support personnel such as couriers and holders (i.e., people who store contraband), their storage locations, and their customers must be ascertained.").

The affidavits then outline the investigative techniques that had been used throughout the investigation, set forth the "pros" and "cons" of each of these methods and specifically identify why the wiretap authorization was necessary. These submissions are comprehensive and significantly detailed. For example, the first affidavit recounts all of the following:

(a) that telephone toll/pen register information had been obtained and analyzed showing that communications had been made by certain members of the organization but not the substance of the calls which is not evident from those techniques;

(b) physical surveillance had been used to some degree but these observations included obvious efforts by the conspirators to avoid such tactics and outlined other difficulties in same;

(c) issuing grand jury subpoenas to compel testimony had been contemplated but was not effective due to threats to witnesses by members of the organization (including Fielder) in past cases and to a confidential source during this investigation;

(d) while some confidential sources had been utilized, the investigators did not believe that additional confidential sources could be developed due to the close-knit nature of the organization's members and likelihood that attempts to do so would undermine other investigative efforts and possibly expose the current confidential sources to harm;

(e) using undercover agents to attempt to infiltrate the organization would be difficult for the same reasons that made using additional confidential sources to investigate the criminal activity problematic;

(f) interviews of witnesses were not likely to be successful for many of the same reasons;

(g) searches were conducted leading to seizure of significant amounts of U.S. currency but did not reveal where the proceeds had come from and other searches such as trash pulls were unsuccessful at locating significant evidence. In addition, review of Fielder's jail calls demonstrated that drug proceeds were moved from one location to another because a white man was observed in the area by members of the organization;

(h) analysis of financial records was another area that was explored but investigators expected that money was disguised by depositing the money in names of family members or other individuals to the extent that financial institutions were used. The

> investigators obtained cash transaction reports on Lloyd Irish from a local casino demonstrating that he was cleaning money at the casino but it did not prove where the money came from or where it went after he left the casino.

(Govt. Ex. 1 at 75-92, Misc. No. 12-58, 1/31/12 Affidavit).  With that backdrop, along with the experience of the investigators, the Government asked for a wiretap on Anderson's cell phone (TT1).  (*Id.*).  The Government then sought additional authorizations on four other phones that investigating officers learned were also used by Anderson and one used by Ewell, with separate applications (TT's 2-6).  (Govt. Ex. 1, Misc. Nos. 12-58(a), 12-58(b), 12-58(c) and 12-58(d)).

The officers' need to intercept communications on Ewell's phone was explained in the second application as follows:

> [t]he absence of interceptions over TT#3 leaves a gap in the Organization's activities.  Eric Ewell is using TT#3.  As demonstrated herein, Ewell coordinates the actions of members of the Organization by providing directions to them.  Significantly, Ewell communicates using TT#3 with other members of the Organization, including Khalid Kareem and Michelle Grissom.  Reliance upon interceptions over TT#1 or the other investigative steps referenced herein without intercepting Ewell's communications over TT #3 would result in the failure to obtain significant evidence about how Ewell coordinates the Organization's activities beyond his communications with Anderson.

(Govt. Ex. 1 at 178, Misc. No. 12-58(a), Affidavit 2/29/12).

As the Government points out, each of the affidavits contains a lengthy and detailed necessity explanation that builds on the prior application, including additional facts gleaned from the continuing investigation:

> The necessity explanation for the first application for TT1, filed at Misc. No. 12-58, is contained on pages 75-92 of the sealed wiretap applications/orders disk referenced above.  The necessity explanation for the second application for TT1 (extension) and TT's 2-3 (initial), filed at Misc. No. 12-58(a), is contained on pages 176-197 of the disk. The necessity explanation for the third

application for TT's 1-3 (extension) and TT4 (initial), filed at Misc. No. 12-58(b), is contained on pages 300-324 of the disk. The necessity explanation for the fourth application for TT2 (extension) and TT5 (initial), filed at Misc. No. 12-58(c), is contained on pages 402-425 of the disk. And the necessity explanation for the fifth and final application for TT6 (initial), filed at Misc. No. 12-58(d), is contained on pages 497-521 of the disk.

(Docket No. 576 at 17-18; *see also* Govt. Ex. 1). Overall, these explanations suffice to demonstrate why the Title III authorizations were necessary to complete the goal of the investigation to dismantle the entire Larimar Drug Organization and obtain evidence sufficient to prove the cited violations of federal criminal statutes beyond a reasonable doubt against its members. *See Williams*, 124 F.3d at 418. These affidavits do not consist of boilerplate recitations of facts relevant to any investigation; instead, each of the affidavits contains detailed and specific facts demonstrating to the Judges authorizing the wiretaps that the necessity requirement had been satisfied. *Id.* Indeed, every Judge reviewing these affidavits, applications and orders held that "[i]t has been adequately demonstrated that normal investigative procedures have been tried and failed to achieve the goal of the investigation, reasonably appear unlikely to succeed if continued or attempted, or are too dangerous to attempt." (Govt. Ex. 1 at 99, Misc. No. 12-58, Order 1/31/12). Finally, Ewell argues that the officers may have been able to utilize some other investigative technique to obtain evidence of drug trafficking and money laundering such as attempting to set up consensual recordings with a confidential informant, but "the utility of other methods of investigation to obtain some information does not foreclose the possibility that a wiretap is necessary to obtain other information." *See Rivera*, 532 F. App'x at 306.

Accordingly, Ewell's motion to suppress is denied to the extent he relies upon an alleged lack of necessity for the authorization of Title III interceptions on his cell phone.

2. Jurisdiction Claim

Ewell next claims that the wiretap evidence gleaned from his cell phone (TT3) should be suppressed because the Court lacked jurisdiction over him and his phone when he was in North Carolina rather than Pittsburgh. (Docket Nos. 492, 669, 692). The Government contends that this "jurisdiction claim" should be denied as the interceptions were monitored within the jurisdiction of the Court at the DEA office in McKees, Rocks, Pennsylvania. (Docket Nos. 576, 682).

Pursuant to § 2518(3), a District Judge has authority to enter an *ex parte* order "authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting (and outside that jurisdiction but within the United States in the case of a mobile interception device authorized by a Federal Court within such jurisdiction)." 18 U.S.C. § 2518(3). Judge McVerry recently summarized the law in *United States v. Gilliam*, adopting the Government's view of "listening post" jurisdiction which has been affirmed by all of the courts of appeals that have encountered the question. *United States v. Gilliam*, No. 02:12-CR-93, 2015 WL 5178197, at *15 (W.D. Pa. Sept. 4, 2015) (citing *United States v. Denman*, 100 F.3d 399, 403 (5th Cir. 1996)) ("this Court has jurisdiction if either: (1) the phone is located in this district; or (2) the interception of calls occurs within this district."). In so doing, Judge McVerry held that the interception of TT3 was authorized by Title III given that the DEA's McKees Rocks "listening post" where calls are intercepted, monitored and recorded is located within this District. *Id.*

Ewell suggests that this Court should adopt the reasoning of Circuit Judge Meskill of the United States Court of Appeals for the Second Circuit, set forth in his concurring opinion to the 1992 decision of *United States v. Rodriguez*, 968 F.2d 130, 143-145 (2d Cir. 1992), which criticizes the scope of Title III jurisdiction permitted under section 2518(3). The Court declines

to do so as the concurrence in *Rodriguez* is non-binding, unpersuasive and clearly a minority position that has not been adopted by other courts since its issuance over two decades ago. *Id.* Rather, the Court will follow the precedent relied upon in *Gilliam*, holding that this Court has jurisdiction to authorize a wiretap if the listening post is located within this judicial district. *See Gilliam*, 2015 WL 5178197, at *15.

This reasoning is particularly apt given the facts of this case. Ewell does not contest that the "listening post" where the intercepted communications were monitored and recorded was at the DEA offices in McKees Rocks, Pennsylvania and that this information was provided to the reviewing courts. (Docket No. 696 at 4). For example, the affidavit presented in support of the wire application for Ewell's TT3 makes clear that "communications in furtherance of the Specified Federal Offenses will be intercepted over [the target] telephones in the Western District of Pennsylvania. Any interceptions that occur will be monitored contemporaneously in the Western District of Pennsylvania." (Govt. Ex. 1 at 138, 2/29/12 *Affidavit*). In addition, Ewell's TT3, was registered in his name at the address of 1958 Waite St., Pittsburgh, PA 15210, providing yet another link to this District. *Id.*

Ewell also seems to suggest that his location outside of Pennsylvania was undisclosed to the authorizing courts. However, there are numerous references to Ewell being in North Carolina throughout these documents, such as the following:

> …it should be noted that Eric Ewell spends much of his time outside of Pennsylvania as revealed by CS #3, telephone data, and property records. In fact, it appears that Ewell resides part of the time in North Carolina. As a result, physical surveillance of Ewell while he is alone or meeting with associates is extremely difficult. The geographical divide between Ewell and his associates, including Anderson, highlights the need and the value of intercepting their telephone communications. They often cannot meet in person to discuss their criminal activity.

(Govt. Ex. 1 at 81, Misc. No. 12-58, Affidavit 1/31/12). This same passage is repeated in the later affidavit authorizing the wiretap on Ewell's phone, TT3. (Govt. Ex. 1 at 184, Misc. No. 12-58(a), Affidavit 2/29/12). There are several other instances throughout the applications, and affidavits referencing that Ewell and his TT3 were located at times in North Carolina and the same information was embodied in the corresponding Orders and Orders to Service Providers. (Govt. Ex. 1at 170, Affidavit 2/29/12 ("On February 9, 2012, Ewell, using TT3, called TT1 and spoke to Anderson. Ewell was in Charlotte, North Carolina, where he resides for at least part of the time."); 113 ("Pursuant to 18 U.S.C. § 2518(3), this request includes interception of communications occurring while Target Telephones #1, #2, and #3 are outside the jurisdiction of the Western District of Pennsylvania but within the United States"); at 107 ("Pursuant to 18 U.S.C. § 2518(3), this order includes interception of communications occurring while the telephone facilities referenced herein are outside the jurisdiction of the Western District of Pennsylvania, but within the United States.").

For these reasons, Ewell's motion to suppress is denied to the extent that he claims the authorizing courts lacked jurisdiction to approve the interceptions of his cell phone.

3. Minimization Claim

Ewell further argues, rather generally, that the investigating agents did not sufficiently minimize communications between him and a lawyer, Eric Montgomery, Esquire of the Montgomery Law Firm, his girlfriend, Shayla Hawkins, and other business associates in North Carolina. (Docket Nos. 491, 669, 696). The Government counters that Defendant has not raised this issue with sufficient specificity as Ewell has not pointed to the specific communications that he believes should have been minimized and explained why the Government's minimization techniques were unreasonable. (Docket Nos. 576, 682). Despite his filing of a Supplemental

Memorandum and post-hearing briefing, Ewell still has not met the Government's challenge to provide a sufficient factual foundation to support his minimization claim. (Docket No. 696).

18 U.S.C. § 2518(5) requires as follows:

> Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days.

The Court of Appeals has long held that "[s]ection 2518(5) does not prohibit the interception of all non-pertinent conversations; rather it requires the government to conduct the wiretap so as to minimize the interception of such calls. The minimization standard is one of reasonableness of a particular interception, which is to be ascertained on a case-by-case analysis." *United States v. Armocida*, 515 F.2d 29, 42 (3d Cir. 1975); *see United States v. Hull*, 456 F.3d 133, 142-43 (3d Cir. 2006) ("Our inquiry is on the 'reasonableness' of minimization efforts, under the totality of the circumstances."). When general allegations are made, all that is required is a showing that a good faith effort to minimize was attempted. *Id.* at 44. Further, "when investigating a wide-ranging conspiracy between parties known for their penchant for secrecy, broader interceptions may be warranted" and "[t]he mere *number* of intercepted, but non-pertinent, calls is not dispositive." *Hull*, 456 F.3d at 143 (emphasis in original). In any event, the remedy for a minimization violation would be suppression of the challenged calls that were not minimized rather than the entirety of the Title III evidence.

With respect to Defendant's girlfriend and business associates, the Government has presented sufficient information to show that a good faith effort was made to minimize the calls to defeat the general complaints put forth by Ewell. (Docket Nos. 576, 682). But, given the nature of the investigation, which included money laundering offenses, these were not the types

of calls that needed to be minimized. (Govt. Ex. 1 at 134-37, Affidavit 2/29/12). To this end, one of the purposes of the wiretap included identifying all of the members of the organization, such as anyone holding the drug proceeds and to obtain evidence that money laundering statutes had been violated. (*Id.*). The Government recites its evidence indicating that the involved business discussed by Ewell was believed to be an entity set up for the purpose of laundering his drug proceeds – i.e., one of the alleged criminal acts for which the wiretap evidence was sought. (Docket No. 576). Therefore, Defendant's general assertions that these calls were not pertinent must be overruled as they were clearly pertinent and relevant to the money laundering part of the investigation. *See Armocida*, 515 F.2d at 42.

The issue of the alleged attorney-client privilege violations likewise has not been sufficiently developed by Ewell as he has not presented any evidence to demonstrate that an attorney-client relationship existed and/or that privileged communications were intercepted by the Government, despite it being his burden to demonstrate the existence of an attorney-client relationship and to establish each element of the claimed privilege. *See United States v. Trombetta*, Crim. No. 13-227-01, 2015 WL 4406426 at *16-17 (W.D. Pa. Jul. 20, 2015) ("Defendant bears the burden of proving the existence of an attorney-client relationship by a preponderance of the evidence"); *United States v. Fisher*, 692 F. Supp. 488, 490-91 (E.D. Pa. 1988) (citations omitted) ("the party asserting the privilege bears the burden of proving the existence of each element of the privilege."). In light of these standards, Ewell has failed to meet his burden to demonstrate the existence of an attorney-client relationship with Montgomery, but even if such relationship is assumed, he has failed to present any evidence showing that the Government intercepted confidential communications that would be protected by the attorney-client privilege. (*See* Docket Nos. 492, 669, 696). Hence, there is no evidentiary basis from

which the Court may suppress the challenged Title III evidence due to any violation of the claimed privilege.

For these reasons, Ewell's motion to suppress is denied insofar as he contends that the Government failed to minimize non-pertinent calls.

4. *Franks* Claim

Ewell further argues that a *Franks* hearing is warranted due to certain material misrepresentations and/or omissions made by the government agents in the affidavits supporting the authorization of the wiretaps on his cell phone. (Docket Nos. 492, 669, 696). In support, Ewell challenges sixteen separate statements, each of which he claims warrant a *Franks* hearing.[8] (Docket Nos. 492, 669). Ewell has attempted to build this claim through his submission of the Government's line sheets transcribing certain intercepted calls, an audio recording of one of the calls, and a brochure for an event that he and Jamell Anderson allegedly attended in Atlanta. (Docket Nos. 492, 669, 696). Ewell has not presented any evidence such as affidavits or witness testimony on these points; rather, his counsel has essentially provided his counter-interpretation of the content of the intercepted calls and pointed to other portions of the record through written brief and oral argument. (*Id.*). The Government responds that Ewell has not met his burden to demonstrate that a *Franks* hearing is necessary in this case, that any of the challenged information provided in the affidavits was false or that the allegedly omitted information would undermine the probable cause found by the authorizing courts. (Docket Nos. 576, 682).

"[A] criminal defendant has the right to challenge the truthfulness of factual statements made in the affidavit of probable cause supporting a warrant subsequent to the ex parte issuance of the warrant." *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (citing *Franks v.*

---

[8] Ewell initially pointed to five statements in his Brief in Support of his Motion to Suppress. (Docket No. 492). Later, in his Supplemental Brief, Ewell raised an additional eleven statements. (Docket No. 669).

*Delaware*, 438 U.S. 154, 171 (1978)). In *Franks*, "the Court created a mechanism to allow a defendant to overcome the general presumption that an affidavit of probable cause supporting a search warrant is valid." *Id.* The Court of Appeals has recognized that the first step under *Franks* requires the defendant to "make a 'substantial preliminary showing' that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, [and] which is material to the finding of probable cause." *Id.* (citing *Franks*, 438 U.S. at 171). Further,

> [i]n order to make this preliminary showing, the defendant cannot rest on mere conclusory allegations or a "mere desire to cross-examine," but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses.

*Id.* at 383, n.8 (quoting *Franks*, 438 U.S. at 171). If the Defendant makes his preliminary showing, the Court has the discretion to hold a *Franks* hearing and permit a further challenge to the affidavits.

> At the hearing, the defendant must ultimately prove by a preponderance of the evidence […]: (1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination.
>
> …
>
> In evaluating a claim that an officer both asserted and omitted facts with reckless disregard for the truth, … : (1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting.
>
> …
>
> In the end, the defendant must prove by a preponderance of the evidence that probable cause does not exist under the corrected affidavit, i.e., that the deficiency in the affidavit was material to the original probable cause finding. [The Court of Appeals has] recognized a distinction between misrepresentations and omissions for purposes of determining whether deficiencies in the affidavit are "material." When faced with an affirmative misrepresentation,

> the court is required to excise the false statement from the affidavit. In contrast, when faced with an omission, the court must remove the "falsehood created by an omission by supplying the omitted information to the original affidavit."

*Yusuf*, 461 F.3d at 383-84 (internal citations omitted).  If the defendant is able to ultimately meet this burden, "the Fourth Amendment requires that ... the fruits of the search [must be] excluded." *United States v. Zareck*, 2010 WL 5053916 at *17 (W.D. Pa. 2010) (quoting *Yusuf*, 461 F.3d at 383) (internal citations omitted).

Before addressing the lack of evidentiary support provided for the alleged fraudulent misrepresentations/omissions in the affidavits cited by Ewell, it appears that one of his main complaints is that the affidavits rely on law enforcement officers' alleged erroneous interpretations of the recorded conversations in formulating the probable cause to authorize the Title III interceptions.  (Docket Nos. 492, 669, 696).  A second but related complaint is that Ewell contests the Government's assertion that he is a high or top ranking member of the Larimer Organization, arguing that this position is unfounded.  (*Id.*).

It is true that the assertion that Ewell is a high ranking member of the organization is based upon a hearsay statement that Detective Harpster attributed to CS#3.  (Govt. Ex. 1 at 50-53, Misc. No. 12-58, Affidavit 1/31/12).  But, "[a]n affidavit or a complaint may be validly based on hearsay information." *United States v. Caple*, 403 F. App'x 656, 659 (3d Cir. 2010) (quoting *United States v. Schartner*, 426 F.2d 470, 473 (3d Cir. 1970)).  The challenged hearsay assertion is corroborated by a detailed explanation why the experienced law enforcement officer believes that the information provided by CS#3 is truthful including his substantial connection to the Larimer Drug Trafficking Organization and the controlled buys that he had made from several of its members throughout 2011.  (*See* Govt. Ex. 1 at 50-53, Misc. No. 12-58, Affidavit 1/31/12). The supporting affidavit to a search warrant is to be read in its entirety and in a "common sense,

nontechnical manner." *United States v. Miknevich*, 638 F.3d 178, 182 (3d Cir. 2011). This includes "all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information." *Gates*, 462 U.S. at 238–39. Hence, Detective Harpster's statements attributed to CS#3 and his opinion of this individual's veracity can provide the foundation for the issuing judge's probable cause determination and are not legitimately objectionable here. *See id.*

As to the interpretations of coded language, when evaluating an affidavit of probable cause, a court "may properly take into account affirmations which are founded in part upon the experience of specially trained agents." *Williams*, 124 F.3d at 418. Stated another way, "[t]he issuing judge or magistrate may give considerable weight to the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." *United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000) (quotation omitted). In a trial context,

> [i]t is well established that experienced government agents may testify to the meaning of coded drug language under Fed.R.Evid. 702. Because the primary purpose of coded drug language is to conceal the meaning of the conversation from outsiders through deliberate obscurity, drug traffickers' jargon is a specialized body of knowledge and thus an appropriate subject for expert testimony. Such testimony is relatively uncontroversial when it permits a government agent to explain the actual meanings of coded words-that is, when the agent acts as a translator of sorts.

*United States v. Berry*, 132 F. App'x 957, 962 (3d Cir. 2005). "[T]here are limits to the extent to which a trooper may interpret coded conversations as an expert witness at trial, [but] the evidence that may be used to support a search warrant is much broader than the evidence that

would be admissible at trial." *United States v. Majeed*, Crim. No. 08-186, 2009 WL 2424609, at *7 (E.D. Pa. Aug. 4, 2009).

Numerous courts have recognized that judges may rely upon experienced agents' interpretations of coded and cryptic conversations in drug cases to support affidavits of probable cause. *See e.g.*, *Gilliam*, 2015 WL 5178197, at *14 (upholding probable cause for numerous reasons and noting that "[t]o evade detection, the targets used coded language and also used multiple different telephones. Thus, the government has satisfied the necessity and probable cause prerequisites"); *Majeed*, 2009 WL 2393439, at *3 (internal citations omitted) ("In this case, the warrant and extension applications contain the affiants' interpretations of many cryptic and coded conversations among the suspected conspirators. These interpretations are supported by the affiants' training and experience regarding 'the methods, devices, and modus operandi' of drug traffickers as well as the 'language, code numbers, code words and slang terms used to refer to controlled substances.' Courts have specifically found that troopers' interpretations of coded conversations can support probable cause in obtaining a warrant. Accordingly, in assessing the sufficiency of the evidence contained in the warrant and extension applications, we rely on the affiants' interpretations of cryptic and coded language contained in the calls."); *United States v. Agurs*, No. 14-3862, --- F. App'x ---, 2015 WL 5817659, at *2 (3d Cir. Oct. 6, 2015) ("Agurs claims that the intercepted conversations reported in the affidavit did not directly discuss heroin and that references to his house, his parking lot, and his associates do not mean that he was involved in any meetings or drug transactions. But it would be highly unusual for conspirators to discuss drugs by their proper names rather than coded or oblique references, and an investigating agent's interpretations of coded conversations can support a finding of probable cause."); *cf. United States v. Gorny*, Crim. No. 13-70, 2014 WL 2860637, at *5 (W.D. Pa. June 23, 2014)

("The alleged 'expert-type testimony' provided by the detectives in the affidavits merely helps to inform this analysis and it is plainly appropriate for the issuing magistrate judge to consider and rely on the significant experience of the affiants in investigating violations of narcotics offenses, making undercover buys and the use of cell phones by sellers and buyers in the drug trade.").

Ewell has challenged neither Detective Harpster's qualifications nor his experience to provide opinions interpreting the coded language used by narcotics traffickers. (Docket Nos. 492, 669, 696). In any event, Detective Harpster's affidavits provide more than sufficient detail concerning his training and experience to permit the issuing District Judges to rely upon his interpretations of the coded language in the recorded jail calls and Title III authorized intercepted communications. (*See e.g.*, Govt. Ex. 1, Misc. No. 12-58, Affidavit 1/31/12). His extensive experience in law enforcement and drug investigations is put forth on the first three pages of each affidavit supporting the five applications. (*Id.*). He is a Pittsburgh police detective and a task force officer with the DEA; he had been a law enforcement officer 12 years at the time of the applications; he had participated in numerous narcotics investigations utilizing confidential informants and other surveillance methods, such as pen registers and toll analysis and Title III intercepts; he worked in the violent crimes and firearms unit and was responsible for conducting controlled substances investigations. (*Id.*). Pertinent here, Detective Harpster is "familiar with the methods and language used by traffickers to smuggle, store and distribute drugs, collect and launder drug proceeds, and avoid getting caught by law enforcement officers." (Govt. Ex. 1 at 40, Misc. No. 12-58, Affidavit 1/31/12). Additionally, Detective Harpster advised that:

> I am aware that it is common practice for drug traffickers who desire to insulate themselves from detection by law enforcement agents to utilize multiple telephones, fictitious identities, coded communications, and other counter-surveillance techniques in communicating and meeting their customers, suppliers, couriers and other conspirators. It is not unusual for drug traffickers to

> subscribe some or all of their telephones in the names of other real
> or fictitious people. Moreover, it is very common practice for drug
> traffickers to utilize all communication features of their telephones,
> most notably the voice call and text message features, nearly
> simultaneously to communicate with their conspirators. For
> example, it is quite common for a particular transaction to be set
> up and completed using both voice calls and text messages. In
> fact, it is now quite unusual for a drug trafficker to utilize solely
> one feature of a telephone such as the voice call feature, to further
> his criminal activities while not also using another feature, such as
> the text message feature, to further his criminal activities.

*Id.* Therefore, Detective Harpster was and is sufficiently qualified and experienced to provide his opinions concerning the content of the intercepted recordings.

Returning to the specific claims raised by Ewell in support of his motion for a *Franks* hearing, he contests five portions of the affidavits in his initial Motion and another eleven portions of the affidavits in the Supplemental Memorandum. (Docket Nos. 492, 669, 696). Having studied same, it is this Court's opinion that Ewell's Motion seeking a *Franks* hearing must be denied due to a lack of evidentiary support as to each of these claims. Again, it is Ewell's burden to make a "substantial preliminary showing" consisting of "an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses." *Yusuf*, 461 F.3d at 383, n.8 (quoting *Franks*, 438 U.S. at 171). Ewell has not satisfied his burden because he has presented only argument of counsel providing a counter-interpretation of some of the intercepted communications without supplying the necessary evidentiary link demonstrating that Detective Harpster made materially false statements or omitted material information in the affidavits *and* did so knowingly or with a reckless disregard for the truth. At most, Ewell has raised speculative and conclusory allegations with respect to the challenged statements and omissions which are insufficient to meet his burden for a hearing under *Franks*. *See United States v. Wade*, 956 F. Supp. 2d 638, 651-52 (W.D. Pa.

2013). Thus, the Court will not hold a *Franks* hearing solely because Ewell has a desire to cross-examine the agent regarding this information in advance of trial. *See Franks*, 438 U.S. at 171.

In addition, the Government is correct that outside of the challenged statements that Ewell was a top ranking member of the Larimer Drug Trafficking Organization attributed to CS#3, and information concerning a traffic stop he was involved in during 2005, Ewell's objections largely focus on the evidence obtained from the authorized Title III interceptions. (*See* Docket Nos. 492, 669, 696). But, the Title III interceptions were not authorized until January 31, 2012, with the intercepted communications taking place between February and June of 2012 and were not the sole source of information provided by law enforcement outlining Ewell's involvement in this drug trafficking conspiracy. (*See* Govt. Ex. 1, Misc. No. 12-58, Affidavit 1/31/12). In this regard, as outlined in the affidavits, the agents had obtained Fielder's jail calls from October through December of 2011 which included, among other things, communications between Ewell and Fielder that Detective Harpster determined involved drug trafficking and collecting drug proceeds. (Govt. Ex. 1 at 59-73, Misc. No. 12-58, Affidavit 1/31/12). Because Ewell has not meaningfully challenged the interpretation of his conversations with Fielder on the jail recordings, nor demonstrated the unreasonableness of the other pre-wiretap information showing that confidential informants identified Ewell was a high ranking member of the organization, coupled with the numerous contacts between Ewell and Jamell Anderson during February of 2012, there is more than sufficient probable cause to authorize the interceptions of Ewell's cell phone communications during March and April of 2012. *See Yusuf*, 461 F.3d at 383-84. Stated another way, even if the alleged false statements were excised from the affidavits, and/or the omissions were added to same, which the Court expressly holds is not warranted, the remaining information contained within the warrants would still suffice to

authorize the wiretap of Ewell's TT3.  *See id.*  Overall, the Court believes that it was reasonable for law enforcement to seek the interceptions of Ewell's cell phone in furtherance of the ambitious and broad investigatory purposes to dismantle the entire Larimer Drug Trafficking Organization and locate all criminal actors associated therewith.  (*See* Govt. Ex. 1 at 134, Misc. No. 12-58, Affidavit 1/31/12).

Given the above rulings, the Court need not delve into the minutia surrounding the unsupported claims made by Ewell challenging the affidavits.  *See Franks*, 438 U.S. at 171. However, the Court briefly addresses same as each fails for independent reasons, including that the alleged false statements or omissions are: (1) non-material and unrelated to the probable cause determination; (2) not false or misleading; (3) based on well-supported opinions of the experienced agent that are not undermined by the proposed additions; or, (4) not even contained in one of the challenged affidavits.

With respect to the first category, Ewell's challenge to the detective's summary of his 2005 arrest set forth in the January 31, 2012 affidavit, (Govt. Ex. 1 at 48, Misc. No. 12-58, Affidavit 1/31/12), contests the truthfulness of statements that are not material to the ultimate probable cause determination.  (*See* Docket No. 669 at 3).  At most, this is background information concerning Ewell and his arrest record and the alleged misstatements concerning: whether Ewell was driving a rented car during this traffic stop in 2005; if the business he told officers he was working at was operational; and if the seized funds were ultimately returned to him.  (Govt. Ex. 1 at 48, Misc. No. 12-58, Affidavit 1/31/12).  But, such information has no real bearing on whether there is probable cause to tap Jamell Anderson's cell phone in 2012.  In addition, Ewell's claim that the number of contacts on his cell phone was "overstated" by the detective in the February affidavit is unproven and otherwise immaterial to the probable cause

determination. (Govt. Ex. 1 at 173-74, Misc. No. 12-58(a), Affidavit 2/29/12). The affidavit simply recounts the total number of contacts (calls and texts) on the phone that took place but could not be monitored without a court order, and does not suggest to the court that all of these contacts involved narcotics trafficking, as Ewell claims. (*Id.*). Accordingly, there is no basis for a *Franks* hearing to explore these issues. *Yusuf*, 461 F.3d at 383, n.3.

The Court is also persuaded by the Government that a second category of the challenged statements are neither false nor misleading. To reiterate, innocent mistakes and negligent errors by the law enforcement agents cannot serve as the basis for a *Franks* hearing. *Id*. Of note, the alleged inconsistency between the detective's description of Jamell Anderson's quick movements after his acquisition of a heroin supply as typical of drug trafficking and a one-hour long meeting that Anderson had with another individual, "Brice," that occurred some two weeks later are neither false nor misleading as the dates are provided in the affidavit. (*See* Govt. Ex. 1, Misc. No. 12-58(a), Affidavit 2/29/12). Further, the detective's statement that Ewell did not attempt to contact Jamell Anderson again during a traffic stop on the Parkway East is neither false nor misleading because he did not include in the affidavit that Ewell called and texted Anderson around two hours later with Anderson not responding as he had been arrested and detained for heroin possession. (Govt. Ex. 1, Misc. No. 12-58(b), Affidavit 3/23/12).

Next, the assertion that Michelle Grissom – Fielder's girlfriend and Ewell's cousin – served as a go-between for discussions between Fielder (who remained incarcerated and did not want to talk on the prison phones) and Ewell is not false simply because law enforcement only intercepted one such communication after the wiretap was placed on Ewell's cell phone. (Govt. Ex. 1 at 179, Misc. No. 12-58(a), 2/29/12 Affidavit). The information in the affidavit was not inaccurate as the detective was aware from the jail recordings that Grissom played such a role

quite often during late 2011 and into early 2012 and the fact that she discontinued to do so in the months following the interception of Ewell's calls does not disprove same. (Govt. Ex. 1 at 141-43, 145; 174-75). Finally, the fact that Ewell knew Damon "d auk" Agurs from other relationships unrelated to their respective drug trafficking escapades and that Agurs did not have a heroin conviction at the time, undermines neither the assertions by the agent that Agurs was a known heroin dealer nor that Ewell's statement to Jamell Anderson of "nigga d auk said hit em" was a directive to Anderson to contact a heroin customer. (*See* Govt. Ex. 1 at 165; Misc. No. 12-58(a), Affidavit 2/29/12). Indeed, Agurs was being simultaneously investigated for heroin trafficking by the FBI and was later charged and pled guilty to heroin related crimes for conduct occurring around the same time period. *See United States v. Agurs*, No. 14-3862, --- F. App'x --, 2015 WL 5817659, at *2 (3d Cir. Oct. 6, 2015). Therefore, the Court holds that none of these claims provide sufficient justification to hold a *Franks* hearing. *Yusuf*, 461. F3d at 383, n.8.

Moving on, the third category of challenged statements involves supposedly omitted information that Ewell proffers renders the agent's interpretation of the calls erroneous but the same does not undermine the experienced detective's well-founded opinions that the conversations he was interpreting involved probable drug trafficking. (*See* Docket Nos. 492, 669, 696). This category includes Ewell's claims as to the nature of intercepted communications surrounding three trips that took place in February and March of 2012 that he alleges were for non-criminal purposes, i.e., Jamell Anderson's early February trip to New York City to meet with "jewelers," (Govt. Ex. 1, Misc. No. 12-58(a), Affidavit 2/29/12); Anderson's trip to Charlotte to meet with Ewell and their continuing trip to Atlanta in late February where they attended a hair show, (Govt. Ex. 1 at 170-73, Misc. No. 12-58(a), Affidavit 2/29/12); and Ewell's trip to Pittsburgh in early March to work on a rental property that the investigators pointed out

coincided with a heroin re-supply trip Anderson was taking to New York City, (Govt. Ex. 1 at 278-79, Misc. No. 12-58(b), Affidavit 3/23/12). In this Court's estimation, the absence of the alleged non-insidious facts is non-material and their inclusion would not disprove the detective's opinion that these trips included drug trafficking. *See Yusuf*, 481 F.3d at 383-84.

Simply put, an individual can travel to New York City and both shop for jewelry and meet with heroin suppliers – these activities are not mutually exclusive. The same with attending a hair show in Atlanta and dealing with basement issues at a rental property in Pittsburgh as neither activity wholly precludes drug trafficking at other times during the trip. Moreover, Ewell claims that his discussion concerning "renter's insurance" with Jamell Anderson was non-criminal as he may have had contact with an insurance company at other times but such facts do not explain why Anderson would "want in" on such renter's insurance. (Docket Nos. 669, 696). In any event, "renter's insurance" had nothing to do with their supposed attendance at a hair show in Atlanta – a location where Detective Harpster knew co-conspirator Khalid Kareem had a heroin supplier. (Govt. Ex. 1, Misc. No. 12-58, Affidavit 1/31/12). Further, purchasing expensive jewelry and investing in real estate are well known ways that drug dealers launder money and such activities were well within the scope of the investigation of the Larimer Drug Trafficking Organization which included finding evidence of any violations of money laundering statutes as well. *See United States v. Chandler*, 326 F.3d 210, 215 (3d Cir. 2003) (evidence concerning drug dealer's finances admissible in drug prosecution).

The result is the same for Ewell's complaints about the detective's opinions concerning conversations referencing "Brandy" and "Steel" as well as the comments about the arrest of co-conspirator Andrew "Red" Anderson. (Docket Nos. 492, 669, 696). Ewell suggests that these

communications[9] involve only trying to help other individuals find lawyers to represent them. (*Id.*). On the surface, this argument may seem noble; however, Detective Harpster was aware that the members of the Larimer Drug Trafficking Organization had a "common purpose" to obtain lawyers for any members that were arrested and bail them out of jail so that they would not cooperate with law enforcement. (Govt. Ex. 1 at 186, Misc. No. 12-58(a), Affidavit 2/29/12). Given this background information, it was reasonable for the experienced narcotics agent to infer that Ewell's repeated comments to Jamell Anderson concerning "Red" that they had better "get his ass out" of jail were made in hopes that he would not cooperate with investigators. (Govt. Ex. 1 at 160-63, Misc. No. 12-58(a), Affidavit 2/29/12). Ewell also claims that a March discussion about "yaa yaa" was a reference to his brother who goes by that nickname and, therefore, could not have involved drug trafficking. (Govt. Ex. 1 at 279-80, Misc. No. 12-58(b), Affidavit 3/23/12). But, the Government has pointed to other communications in the record that involved "yaa yaa" calling Jamell Anderson about "movies" – a well known term for drugs – resulting in Anderson complaining that "yaa yaa" was "talking reckless" and Ewell responding to "tell his rookie ass that nobody talks on phones." (Docket No. 682 at 63). All told, there is no basis for a *Franks* hearing on any of the claims in this third category.

Ewell finally challenges a statement to take a "nizzy" to an associate named "Moula" and "put it in a mail slot" that he attributes to one of the affidavits supporting the wire authorizations. (Docket No. 669). However, the Government points out that this statement is not present in any of the affidavits supporting the Title III applications and, rather, was made in support of an application for cell site information that Ewell has not sought to suppress. (Docket No. 682 at 60-61). Ewell has not responded to this position in his Reply. (Docket No. 696). Given same,

---

[9]    This would include the audio recording of an intercepted call between Jamell Anderson and "Brandy" submitted along with the Reply Brief. (*See* Docket No. 696 at 10).

the Court agrees with the Government that this alleged statement cannot serve as the basis for a *Franks* hearing challenging the Title III authorized wiretaps on Ewell's cell phone.

To conclude, Ewell's motion to suppress must also be denied to the extent that he seeks a *Franks* hearing to probe the alleged statements and omissions that he has pointed to in his briefs as he has failed to meet his burden to justify such a proceeding. *See Franks*, 438 U.S. at 171.

V.      CONCLUSION

Based on the foregoing, Ewell's Motion to Suppress [491] and Fielder's Motion to Quash [623] are DENIED.  An appropriate Order follows.


<u>*s/Nora Barry Fischer*</u>
Nora Barry Fischer
U.S. District Judge


Date:   February 8, 2016

cc/ecf:  All counsel of record.